# Enforcement by Federal Magistrates of Summonses Issued by the Federal Bureau of Investigation in Aid of Criminal Investigations and Foreign Intelligence Activities

Certain proposed legislation would have granted the Federal Bureau of Investigation power to issue summonses ordering the production of physical and documentary evidence in aid of federal criminal investigations and foreign intelligence activities. A provision of that legislation allowing United States magistrates to enter orders enforcing such summonses would raise problems under Article III of the Constitution, because it could entail the exercise of the judicial power by officials lacking life tenure and guaranteed non-diminution of compensation.

The Article III problems presented by the foregoing provision could be eliminated by providing that the magistrate's order would be treated as a report of findings and recommendations, subject to *de novo* review by a United States district judge with respect to findings and recommendations of the magistrate as to which objection is made by any party, whereby the judge could accept, reject, or modify the findings or recommendations of the magistrate.

A provision in the proposed legislation would permit the ex parte issuance of an order prohibiting disclosure of such FBI summonses upon a showing that such disclosure might endanger life or property; cause the flight of a suspect; result in the destruction of or tampering with evidence, or the intimidation of potential witnesses; or defeat federal remedies or penalties. Under the standard articulated in *Mathews* v. *Eldridge*, 424 U.S. 319 (1976), the absence of a predeprivation hearing in this provision would not appear to violate the requirements of the Due Process Clause.

December 11, 1986

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
OFFICE OF LEGISLATIVE AFFAIRS

You have requested the comments of this Office on a proposed bill to grant the Federal Bureau of Investigation the power to issue a summons to acquire physical and documentary evidence in aid of criminal investigations and foreign intelligence activities.

The authority will reside in the Director of the FBI, who may delegate it to supervisory level Special Agents. The summons must be issued in writing, must describe the materials sought with reasonable specificity, and must provide sufficient time to assemble and make available the materials requested. The Attorney General, in consultation with the Director of the FBI, is to promulgate regulations governing the issuance of a summons. Service of the summons on a natural person must be by personal service. For a corporation, partnership, or other association, service may be by personal service or by

registered or certified mail. Service may be national. United States District Courts have jurisdiction to enforce or to modify or vacate a summons on petition of the government or of the person served, respectively.[1] A magistrate or district judge may enter an order enforcing a summons or granting relief from a summons; disobedience of such an order is punishable by contempt. All petitions relating to foreign intelligence are to be heard in the Foreign Intelligence Surveillance Court.

The proposed bill contains certain limitations on summons authority, including a provision proscribing the required production of materials that could not be obtained under the standards governing a subpoena *duces tecum* issued in aid of a grand jury investigation. Finally, the bill allows a court, per a district judge or magistrate, to issue an *ex parte* order prohibiting disclosure of the existence of a summons where such disclosure would jeopardize life or physical safety or would interfere with various law enforcement objectives. Such an order may be challenged in district court, and a district judge or magistrate may set it aside or modify it. Where the Director of the FBI, a Special Agent, or a designated Assistant Special Agent certifies that the summons is being issued for foreign intelligence purposes, the statute prohibits disclosure of its existence. This prohibition against disclosure may be challenged in the Foreign Intelligence Surveillance Court.

This Office has comments with respect to three aspects of the bill. First, we believe that the provision allowing magistrates to enter final district court orders enforcing the summons poses a constitutional problem, because Article III requires that the judicial power of the United States be exercised by an official with life tenure and guaranteed non-diminution of compensation. Second, the non-disclosure provisions impinge on the summoned party's liberty interests and, therefore, raise questions about due process of law. Third, the provision limiting the request for materials to those obtainable under a subpoena *duces tecum* issued in aid of a grand jury investigation seems to be at odds with part of the rationale for proposing the legislation. We address each issue in turn.

## I. The Use of Magistrates to Enforce the Summons

The proposed bill poses a potential constitutional problem with respect to the enforcement authority that it appears to confer upon United States magistrates. Insofar as § 1(d)(3) gives the district court "jurisdiction to hear and determine" a petition for enforcement of the administrative summons or for relief from the summons, no issue of constitutionality arises. Section 1(d)(3) continues, however, by stating: "The petition may be heard and an order entered by a district judge or United States Magistrate for the district in which the petition was filed. Any failure to obey the order of the court may be punished as a contempt

---

[1] Venue lies in the judicial district in which the summons is served, in which the investigation is pending, or in which the summoned person resides or carries on business or may be found.

thereof."[2] This provision appears on its face to empower United States magistrates to enter final orders of the district court, punishable by contempt of court. If so, any such attempt to delegate this inherently judicial function to a United States Magistrate, an office not endowed with the attributes of guaranteed non-diminution of salary or life tenure,[3] may run afoul of Article III's requirement that "the judicial Power of the United States" be exercised by judges with undiminishable compensation and tenure "during good Behaviour." U.S. Const. art. III, § 1.

The starting point for analysis is *ICC* v. *Brimson*, 154 U.S. 447 (1894), in which the parties against whom the agency had issued a summons resisted enforcement in federal court on the ground that permitting or requiring courts of the United States to "use their process in aid of inquiries before" a federal agency failed to meet the case or controversy requirement of Article III. *Id.* at 468. In rejecting this argument, the Court noted that Congress has the power to regulate interstate commerce and that it would "go far towards defeating the object" of giving Congress the commerce power if the Court held that Congress could not "establish an administrative body with authority . . . to call witnesses before it, and to require the production of books, documents, and papers . . . relating to the subject." *Id.* at 474. The *Brimson* Court found that Congress' use of the courts of the United States was an appropriate means to effectuate this power because

> [t]he inquiry whether a witness before [an agency] is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination. Such a body could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment.

*Id.* at 485. Analogizing the enforcement proceedings to the prosecution of a person indicted under a statute requiring that person to appear or to produce certain materials, the Court further stated that "[t]he performance of the duty which, according to the contention of the government, rests upon the defendants, cannot be directly enforced except by judicial process." *Id.* at 487. In this vein, the Court added that summons enforcement involved "questions judicial

---

[2] This provision seems to apply equally to petitions for enforcement by the government and petitions for relief by the parties. The analysis with respect to both kinds of petition is the same, for the result of either petition will be an order enforcing the summons if valid and enforceable or an order denying enforcement if not.

[3] Under 28 U.S.C. § 631(e), a full-time magistrate has a term of eight years and a part-time magistrate serves for four years. A magistrate may be removed before the end of his term for "incompetency, misconduct, neglect of duty, or physical or mental disability" and a "magistrate's office may be terminated if the judicial conference determines that the services performed by his office are no longer needed." *Id.* § 631(i). Although 28 U.S.C. § 634(b) provides that "the salary of a full-time magistrate shall not be reduced, during the term in which he is serving, below the salary fixed for him at the beginning of that term," this guarantee is not of constitutional dimension, and Congress can revoke this provision simply by amending Title 28.

in their nature, and presented in the customary forms of judicial proceedings." *Id.* at 487.

*Brimson*'s statement that the power to enforce an administrative summons cannot be committed to an administrative or executive "tribunal," created pursuant to Congress' Article I powers, necessarily suggests that such enforcement constitutes a part of the "judicial Power of the United States" and that only an official endowed with Article III's guarantees of undiminished compensation and tenure during "good Behavior" could constitutionally compel compliance with a summons. Given Congress' power to create Article I tribunals with significant judicial attributes short of these Article III characteristics, no other rationale for the Court's conclusion suggests itself. Indeed, the *Brimson* Court's explicit reliance on "our system of government" shows that the Court was employing a separation of powers analysis, which, insofar as it addressed the proper forum for "questions judicial in their nature," necessarily implicated Article III.[4] Thus, the *Brimson* Court's conclusion that the duty to obey a summons "cannot be enforced except by judicial process" must be taken as a constitutional pronouncement that commits such enforcement to Article III courts.[5]

Some lower courts have questioned the continuing vitality of this aspect of *Brimson*. For example, in *Federal Maritime Comm'n v. New York Terminal Conference*, 373 F.2d 424, 426 n.2 (2d Cir. 1967), Judge Friendly suggested that "Congress might well consider whether the long record of frustration and less restrictive modern notions of the separation of powers might not make it wise to empower at least some administrative agencies to enforce subpoenas without having to resort to the courts in every case." Presumably, Judge Friendly's conception of "less restrictive modern notions of the separation of powers" is a reference to the rise of the modern administrative state and the fact that it has now become a commonplace for Article I agencies to adjudicate so-called "public rights." *Cf. Atlantic Richfield Co. v. Dep't of Energy*, 769 F.2d 771, 793–94 (D.C. Cir. 1984) (relying on the advent of the modern administrative state and on the public rights doctrine to uphold the application of discovery sanctions by an agency in response to a party's disobeying a subpoena).

The concept of "public rights" is, at best, elusive and, at worst, unfathomable. The essence of the "public rights" doctrine is that Congress itself has the power to decide, or may delegate to an executive agency the authority to decide, "cases . . . which arise between the Government and private persons in connection with the performance of the constitutional functions of the execu-

---

[4] *Cf. In Re Groban*, 352 U.S. 330 (1957), in which the Supreme Court implied by way of *dictum* that a state executive officer could issue a subpoena and punish non-compliance by contempt. There is nothing to suggest that this dictum has any application to the federal level or otherwise limits *Brimson*.

[5] Some judges have suggested doubt as to whether *Brimson*'s pronouncements on summons enforcement were of constitutional magnitude. *See, e.g., Penfield Company of California v. Securities & Exchange Commission*, 330 U.S. 585, 603–04 (1947) (Frankfurter, J., joined by Jackson, J., dissenting); *United States v. Zuskar*. 237 F.2d 528, 533 (7th Cir. 1956) ("Since *Brimson* Congress has *customarily* provided for [the] resort to the courts by [administrative] agencies for orders compelling obedience to subpoenas.") (emphasis added). In light of *Brimson*'s reference to "our system of government" and to "due process of law" in announcing the principle that summons enforcement cannot be committed to an Article I tribunal, it is difficult to understand the basis for any such conclusion.

tive and legislative departments." *Crowell* v. *Benson*, 285 U.S. 22, 50 (1932). Because Congress has plenary power to determine these "public rights" issues or to delegate their determination to executive officers, it may, therefore, also take the expedient of committing such determinations to Article I tribunals not meeting the dictates of Article III.[6] *Id.*

The theory that this doctrine undercuts *Brimson* presumably depends on the notion that, insofar as an agency summons relates to "public rights," Congress can commit its enforcement to a non-Article III tribunal. But because the "public rights" doctrine antedates *Brimson, see, e.g., Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 59 U.S. (18 How.) 272 (1856), and because the Court in *Brimson* recognized that the Interstate Commerce Commission's summons power related to matters of public rights, *see* 154 U.S. at 475–77, and nonetheless proclaimed that the enforcement of the Commission's summons could not be committed to a subordinate executive or legislative tribunal, *id.* at 485, any such theory must be dismissed. The *Brimson* Court, in fact, explicitly remarked that the legislative purpose for which the summons was sought did not affect the conclusion that summons enforcement was an inherently judicial function. *See id.* at 487 ("[The enforcement of a summons] is none the less the judgment of a judicial tribunal dealing with questions judicial in . . . nature, and presented in the customary forms of judicial proceedings, because its effect may be to aid . . . the performance of duties legally imposed . . . by Congress in execution of . . . power granted by the Constitution.").

Thus, we conclude now, as we have concluded previously, *see, e.g.*, "Proposed Legislation to Grant Additional Power to the President's Commission on Organized Crime," 7 Op. O.L.C. 128 (1983), that *Brimson* remains good law, *see* 1 K. Davis, *Administrative Law Treatise* § 4:6, at 240 (2d ed. 1978), at least as to the enforcement of a summons through criminal penalties. There are apparent exceptions related to Congress,[7] the application of civil penalties,[8]

---

[6] Although the concept of what constitutes a "public right" has undergone some recent expansion, *see Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U.S. 568, 588–89 (1985) (holding that a dispute between private individuals may constitute a "public rights" case insofar as "Congress has the power, under Article I, to authorize an agency administering a complex statutory scheme to allocate costs and benefits among voluntary participants in the program"), the mere fact of its broader application cannot supply a principled basis for concluding that *Brimson* is no longer good law.

[7] Either House of Congress may compel documentary or oral testimony under pain of criminal contempt. *See Jurney* v. *MacCracken*, 294 U.S. 125, 148 (1935). The basis for this exception to the *Brimson* rule is rooted in the historical powers of the House of Commons, the colonial assemblies, the Continental Congress, and the state legislatures to mete out criminal punishment for contempt, *see id.* at 148–49, a practice that the Supreme Court upheld as constitutional as early as 1821. *See Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204 (1821). This power is narrow and limited to punishing acts that "obstruct the performance of the duties of the legislature." *Jurney*, 294 U.S. at 148. In effect, therefore, *Brimson* must be read as establishing a general rule that the use of criminal contempt to compel testimony for the implementation and enforcement of laws is inherently judicial and must be committed to an Article III court, but that Congress may, according to historical practice, itself use the powers of criminal contempt to safeguard the integrity of the legislative process as such. This limited exception, however, does not suggest that Congress may delegate to an Article I tribunal the power to enforce compelled production of testimony by citing persons for criminal contempt.

[8] With respect to civil penalties, the Supreme Court has sustained schemes in which "Congress has . . . created new statutory obligations, provided for civil penalties for their violation, and committed exclusively
Continued

149

and various monetary claims enforceable in certain Article I courts of limited jurisdiction where the party presumably consents to a waiver of his right to an Article III forum.[9]

The ability of a magistrate under the proposed legislation to enter a final judgment enforcing a summons poses a potential constitutional objection precisely because it exposes the summoned party to possible criminal contempt before any Article III determination of his or her right not to have the summons enforced.[10] Under the proposed legislation, a non-Article III magistrate may initially determine the validity of the summons in light of whatever constitutional or other objections the party may assert.[11] At that point, if the magistrate enters a final order of the district court directing the party to comply with the summons and to produce the "books, records, papers, documents, or other tangible things" that may be reached by § 1(a) of the proposed bill, two choices exist. The party can seek appellate review of this final order of the court, perhaps asking for a stay of the order, or the party can disobey the order and risk a citation for contempt in district court. Neither option preserves the party's right to resist enforcement of a summons in an Article III court without incurring criminal liability.

If the party seeks appellate review, the Article III appellate court does not conduct a *de novo* review of the magistrate's order, but applies a less searching standard of review. *See, e.g., FTC* v. *Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 41 (D.C. Cir. 1985) (upholding a district court's findings in a civil action because they were not "clearly erroneous"). In these circumstances, there will be no determination by an Article III tribunal of the enforceability of the summons, but merely a determination of the adequacy of the non-Article III magistrate's conclusions in that regard.

By the same token, if the party chooses to disobey the magistrate's order, the magistrate can secure a contempt citation against the recalcitrant party by

---

[8] (. . . continued)
to an administrative agency the function of deciding whether a violation has . . . occurred." *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 450 (1977). Thus, in asserting the continuing vitality of the "well-established principle" that Article I tribunals do not have the power to enforce a summons "'by a judgment of fine or imprisonment,'" *see Atlantic Richfield Co.* v. *Dep't of Energy*, 769 F.2d 771, 793 (D.C. Cir. 1984), it appears necessary to append the caveat that this principle is limited to matters involving enforcement through criminal contempt. *But see NLRB* v. *International Medication Systems Ltd.*, 640 F.2d 1110, 1115–16 (9th Cir. 1981) (holding that, because *Brimson* requires that "challenges to agency subpoenas . . . be resolved by the judiciary before compliance can be compelled," an agency cannot apply discovery sanctions in response to a party's refusal to comply with a subpoena).

[9] *See, e.g.*, 26 U.S.C. § 7456(e) (Tax Court).

[10] The following analysis assumes that § 1(d)(3) of the bill does not actually permit the magistrate to cite the party for contempt. Because the language provides that "[a]ny failure to obey [an] order of the court may be punished as a contempt thereof," and does not specify which authority or authorities may apply such a measure, we assume that, with respect to contempt of magistrate's orders, the substantive grant of contempt power may be exercised only pursuant to 28 U.S.C. § 636(e), which governs "acts or conduct" before a magistrate that "shall constitute a contempt of the district court."

[11] A party may oppose the enforcement of a summons on a number of distinct bases, including First, Fourth, and Fifth Amendment objections, attorney-client privilege, reasonableness, and a variety of other substantive and procedural grounds. *See* 3 B. Mezines, J. Stein, & J. Gruff, *Administrative Law* § 21.01[2], at 21–5 to 21–16 (1985).

150

certifying facts to the district court that show "disobedience or resistance to any lawful order" of the magistrate or "failure to produce, after having been ordered to do so, any pertinent document." 28 U.S.C. § 636(e)(1), (3). Even if the district judge at this point undertook a *de novo* review of the validity of the underlying order, the party would nonetheless have been deprived of his or her right to an Article III tribunal. Because the magistrate's decision about the validity of the summons would be entered as a judgment of the court, any *de novo* determination by an Article III judge would be available only after the point at which the party had already disobeyed an order of the court. In other words, under the proposed legislation, criminal liability for contempt could become fixed before an Article III tribunal became available, even though the citation for contempt could be entered only by the district judge. The party would, therefore, have to risk criminal penalties in order to obtain a *de novo* determination of his or her rights by the Article III judge. Subjecting a party to the Hobson's choice of incurring potential criminal contempt penalties or foregoing the right to an Article III tribunal arguably places an impermissible burden on the *Brimson* right to be free of liability for criminal contempt short of an Article III court's determination that the summons sought to be enforced is valid and enforceable.

By contrast, treating the order of the magistrate as a mere recommendation that could not become final until the district court judge undertook a *de novo* review of the magistrate's conclusions would pose no constitutional problem. *See* 28 U.S.C. § 636(b). Under these circumstances, with no final order of the court to disobey at the point of the magistrate's decision, criminal liability for contempt could not become fixed until after the district judge undertook *de novo* review of the magistrate's determinations. Because such criminal liability could attach, therefore, only for resistance to an order as to which the district judge had been the "ultimate decisionmaker," such a scheme would not offend the *Brimson* rule. *See United States* v. *Raddatz*, 447 U.S. 667, 682 (1980) (approving the use of magistrates as adjuncts to Article III judges, provided that the judges exercise supervisory control over the magistrates and remain the "ultimate decisionmaker[s]").

In this respect, the Internal Revenue Service's statutory summons power is instructive. Under the Internal Revenue Code, the district courts have "jurisdiction" to compel compliance with a summons, *see* 26 U.S.C. § 7602(a), yet magistrates,[12] as well as district judges, have the authority to enter "such order[s] as [the judges or magistrates] shall deem proper, not inconsistent with the law . . . of contempts, to enforce obedience to the requirements of the summons and to punish such person for his default or disobedience." 26 U.S.C. § 7604(b). The courts have construed this power narrowly, holding that the Code does not empower a magistrate to enter an enforcement order as a final judgment of the court, *see, e.g., United States* v. *Cline*, 566 F.2d 1220, 1221

---

[12] The Internal Revenue Code refers to United States commissioners, instead of magistrates. 26 U.S.C. § 7604(b). United States commissioners were the predecessors to United States magistrates, and the Federal Magistrate's Act transferred the totality of powers and duties of the former to the latter. 28 U.S.C. § 636(a)(1).

(5th Cir. 1978); *United States* v. *Haley*, 541 F. 2d 678 (8th Cir. 1974), and treating any magistrate's order as a mere recommendation subject to review by the district court according to the strictures of the Federal Magistrate's Act, *see, e.g., United States* v. *First Nat'l Bank of Atlanta*, 628 F.2d 871, 873 (5th Cir. 1980); *United States* v. *Wisnowski*, 580 F.2d 149, 150 (5th Cir. 1978); *United States* v. *First Nat'l Bank of Rush Springs*, 576 F.2d 852, 853 (10th Cir. 1978); *United States* v. *Zuskar*, 237 F.2d 528, 533 (7th Cir. 1956).

As a Departmental proposal, however, it is prudent to avoid the constitutional defect posed if the bill were to be construed as permitting the entry of a final order by a magistrate. Accordingly, this Office strongly recommends that the following language be added to § (1)(d)(3) of the proposed bill:

> Any order entered by a United States magistrate pursuant to authority conferred by this Act shall be treated as a report containing proposed findings of fact and a recommendation for the district judge. Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of the court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

This language would, under the test set out in *United States* v. *Raddatz*, 447 U.S. 667, 681–84 (1980), ensure the constitutionality of the magistrate's role in the enforcement of the FBI summons by retaining the district judge as the "ultimate decision-maker."[13]

It bears noting that the language proposed forecloses magistrates' authority to enter final orders only insofar as that authority derives from the proposed bill. Thus, a magistrate could still enter a final order enforcing an FBI summons pursuant to the independent authority granted in the Federal Magistrates Act. Specifically, 28 U.S.C. § 636(c) provides that

> [u]pon the consent of the parties, a full-time United States magistrate or a part-time United States magistrate who serves as

---

[13] The proposed language would also apply to any petition under § 1(d)(3) for "an order modifying or setting aside . . . a prohibition of disclosure" of the summons. Although *Brimson* does not address the issue of prohibiting disclosure of the existence of a summons, it seems as if the rule set out in *Brimson* should apply with equal force to this matter. First, the prohibition of disclosure of a summons is itself an integral part of summons enforcement, for non-disclosure of a third-party summons may be essential to prevent the thwarting of the investigatory purposes of the summons or may be necessary to preclude otherwise unacceptable costs related to the issuance of a summons (*i.e.*, endangering life or physical safety). Second, many similar issues, such as First Amendment and reasonableness objections, govern the validity of a non-disclosure order. Thus, we believe that the decision whether to order non-disclosure of a summons is an inherently judicial function that must be committed to an Article III tribunal.

152

> a full-time judicial officer may conduct any or all proceedings in
> a jury or nonjury civil matter and order the entry of judgment in
> the case, when specially designated to exercise such jurisdiction
> by the district court or courts he serves. Upon the consent of the
> parties, pursuant to their specific written request, any other part-
> time magistrate may exercise such jurisdiction, if such magis-
> trate meets the bar membership requirements set forth in
> § 631(b)(1) and the chief judge of the district court certifies that
> a full-time magistrate is not reasonably available in accordance
> with [the] guidelines established by the judicial council of the
> circuit.

Although the Supreme Court has never spoken to the constitutionality of this provision, the Courts of Appeals have overwhelmingly endorsed it as constitutional insofar as it is dependent on the consent of the parties. *See, e.g., Fields* v. *Washington Metropolitan Area Transit Authority*, 743 F.2d 890 (D.C. Cir. 1984); *Collins* v. *Foreman*, 729 F.2d 108 (2d Cir.), *cert. denied*, 469 U.S. 870 (1984); *Goldstein* v. *Kelleher*, 728 F.2d 32 (1st Cir.), *cert. denied*, 469 U.S. 852 (1984); *Pacemaker Diagnostic Clinic of America, Inc.* v. *Instromedix, Inc.*, 725 F.2d 537 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824 (1984). The Department, therefore, would appear to have little cause to consider including language that would explicitly negate § 636(c)'s power of consensual reference to magistrates as applied to petitions for enforcement of or relief from an FBI summons.

A word of caution on this point is in order, however. All of the circuit court cases upholding 28 U.S.C. § 636(c) antedate the Supreme Court's recent opinion in *CFTC* v. *Schor*, 478 U.S. 833 (1986). Although *Schor* upheld a scheme in which, with the consent of the parties, the Commodity Futures Trading Commission (CFTC) could exercise pendent or ancillary jurisdiction over common law counterclaims arising out of the transaction or occurrence that formed the basis for the underlying statutory claim, portions of *Schor*'s rationale raises doubts as to the continuing validity of § 636(c). To the extent that *Schor* held that the parties could waive the "personal right" to an Article III tribunal, the decision is highly favorable to the consensual reference provisions contained in the Federal Magistrate's Act. But as to structural concerns involving the separation of powers, the Court found it significant that (1) the scheme involved the exercise of non-Article III power only in the "'particularized area'" of commodities exchange law; (2) CFTC orders were not self-executing and could only be enforced by district courts; (3) orders were reviewed under the "weight of the evidence" standard rather than the "clearly erroneous" standard; (4) the district court had *de novo* review of questions of law; and (5) the CFTC could not exercise all the "ordinary" functions of a district court, such as presiding over a jury trial or issuing writs of habeas corpus. *Id.* at 854–56.

The consensual reference scheme under 28 U.S.C. § 636(c) does not share many of the characteristics that the *Schor* Court found comforting from a

separation of powers standpoint. First, the exercise of a magistrate's authority under the consensual reference provision extends to any "civil matter." 28 U.S.C. § 636(c)(1). Second, although only the district judge can issue a contempt citation to enforce the magistrate's order, *see* 28 U.S.C. § 636(e), that order is nonetheless a final judgment of the district court and, as such, is self-executing. Third, because the judgment entered by the magistrate is appealable "in the same manner as an appeal from any other judgment of [the] district court," 28 U.S.C. § 636(c)(3),(4), the standard of review of factual findings is the "clearly erroneous" standard. *See* Fed. R. Civ. P. 52(a).

Indeed, the consensual reference scheme enjoys only two of the characteristics found significant by the *Schor* Court. First, the Article III court that reviews the magistrate's decision has *de novo* review of all questions of law. Second, while the magistrate can exercise many of the "ordinary functions" of the district court, including the conduct of a jury trial and, presumably, the power to issue a writ of habeas corpus, there remain significant functions, such as the ability to cite a party for contempt, that the magistrate does not possess even under the consensual reference scheme.

Yet, despite the dissimilarities between the CFTC's counterclaim mechanism in *Schor* and the consensual reference provision of the Federal Magistrate's Act, there is reason to believe that the latter still passes constitutional muster. The *Schor* Court found the five factors listed above to be relevant in determining whether the "congressional scheme. . . impermissibly intruded on the province of the judiciary," 478 U.S. at 851–52, but in no way purported to make such factors an exhaustive and exclusive list of the safeguards that could justify the consensual resort to a non-Article III tribunal for matters that would otherwise require adjudication in an Article III court. Indeed, *Schor* may actually buttress the conclusion reached by the Courts of Appeals insofar as it endorses the mode of analysis widely employed in the lower court cases regarding consensual reference.

Under this analytical framework, the parties' consent serves as a waiver of any personal right to an Article III tribunal, and the acceptability of the consensual reference depends on the extent to which the statutory scheme protects the judiciary from "impermissibl[e] intru[sion]" by the executive and legislative branches.

The question of what constitutes an "impermissibl[e] intru[sion] on the province of the judiciary" involves matters of degree, making it difficult to predict with any confidence how the Supreme Court will react to the consensual reference scheme found in 28 U.S.C. § 636(c). The Courts of Appeals, however, have identified several features of the Federal Magistrate's Act as significant protections against the encroachment of the executive and legislative branches on the independence of the judiciary,[14] and, given the widespread

---

[14] First, the magistrates are appointed by district judges and are subject to removal only by the district judges or, in some circumstances, by the circuit judicial council. *See, e.g., Geras* v. *Lafayette Display Fixtures Inc.*, 742 F.2d 1037, 1043 (7th Cir. 1984); *Pacemaker Diagnostic Clinic of America, Inc* v.

Continued

154

concurrence of the Courts of Appeals,[15] it may reasonably be predicted that these features may suffice to sustain the scheme in the Supreme Court under the kind of analysis set out *Schor*.

## II. *Ex Parte* Prohibition Against Disclosure

Section 1(f)(1) of the proposed legislation permits the *ex parte* issuance of an order prohibiting disclosure of an FBI summons upon a showing that "the materials being sought may be relevant to a legitimate law enforcement inquiry and that there is reason to believe that such disclosure may result in: (A) endangering the life or physical property of any person; (B) flight from prosecution; (C) destruction or tampering with evidence; (D) intimidation of potential witnesses; or (E) defeating any remedy or penalty provided for violation of the laws of the United States." The order may be issued by a magistrate or district judge, and the person against whom the prohibition is directed may obtain relief by filing a petition in the district court pursuant to § 1(d)(2) of the proposed bill.[16] Because the prohibition against disclosure of the summons constitutes a clear deprivation of liberty, the issuance of the *ex parte* order must comport with the requirements of the due process clause of the Fifth Amendment. With respect to § 1(f)(2), the issue is thus whether a prompt postdeprivation hearing is sufficient to meet the dictates of due process.

Under *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976):

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

[14] (Continued)
*Instromedix, Inc.*, 725 F.2d 537, 545 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824 (1984). Second, the district judge must specially designate the magistrate to exercise jurisdiction. *See, e.g., Collins* v. *Foreman*, 729 F.2d 108, 115 (2d Cir.), *cert. denied*, 469 U.S. 870 (1984). Third, the district court retains the power to withdraw the reference of the case from the magistrate. *See, e.g., Collins*, 729 F.2d at 115; *Pacemaker*, 725 F.2d at 545. Fourth, the magistrate lacks any power to cite the parties for contempt. *See, e.g., Geras*, 742 F.2d at 1043.

[15] *See* Note, *The Boundaries of Article III: Delegation of Final Decisionmaking Authority to Magistrates*, 52 U. Chi. L. Rev. 1032, 1034 n.16 (1985).

[16] Section 1(f)(1) empowers a magistrate to enter an *ex parte* order imposing the prohibition. Because this order is presumably punishable by criminal contempt pursuant to 28 U.S.C. § 636(e), this Office believes that the same principles that govern summons enforcement under *Brimson* should apply to the entry of a prohibition order, and that language should be added to indicate that an order entered by a magistrate under § 1(f)(1) has no binding effect of its own. Because the proceedings must proceed *ex parte* to serve the interests of prohibiting disclosure, and because review by the district judge prior to entry of judgment cannot proceed, therefore, upon the objections of the party to be bound, language should be added treating every magistrate's order under § 1(f)(1) as a mere recommendation to be given *de novo* review *ex parte* by the district judge before it can become an order of the court.

155

Under this test, it appears that the absence of a pre-deprivation hearing under § 1(f)(1) would pass constitutional muster.

In this case, the first factor appears to favor the constitutionality of § 1(f)(1), for a "claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing." *Id.* at 331. Because the party against whom the summons and prohibition order are directed can immediately go into court and seek relief from the order, that party's liberty interest in speech is only minimally impaired. No irreparable harm will occur if a party must simply wait to disclose the existence of a summons until after a court has heard the party's petition for relief; if the party has a protectible First Amendment or statutory right to disclose the existence of the summons, the use of the *ex parte* procedures set out in the proposed legislation will only delay, and not defeat, that right. This temporary interference with a protected interest will not threaten the very subsistence or well-being of the party, as in *Goldberg* v. *Kelly*, 397 U.S. 254 (1970), a case involving eligibility for welfare benefits, or in *Memphis Light, Gas & Water Division* v. *Craft*, 436 U.S. 1 (1978), a case involving the termination of utility services. Although a permanent or extended deprivation without any hearing might pose serious constitutional problems, the availability of prompt postdeprivation review reduces the harm to the protected interest of the party. *See Mitchell* v. *W.T. Grant Co.*, 416 U.S. 600 (1974).

The possibility of wrongful deprivation also seems slight. Section 1(f)(1) of the proposed bill has set out very narrow and specific bases upon which a non-disclosure order may be issued, and the government must presumably supply concrete evidence showing why it has reason to believe that disclosure would lead to endangerment of life, flight from prosecution, and the like. And the fact that a judge or judicial adjunct makes the initial determination and the judge is the ultimate decisionmaker minimizes the possibility that the deprivation will be in error.[17] *See Mitchell*, 416 U.S. at 616–17 ("The . . . law [at issue] provides for judicial control of the [property sequestration] process from beginning to end. This control is one of the measures adopted . . . to minimize the risk that the *ex parte* procedure will lead to a wrongful taking.").

Finally, the government has a strong interest in the procedure being employed. Disclosure of a summons is an all or nothing proposition. Once it occurs, it cannot be undone. Thus, it is imperative that the government be able to present the summoned party with a prohibition against disclosure under pain of contempt at the time the party becomes aware of the summons. If no legal compulsion existed to preclude disclosure *ab initio*, and the government could not secure the non-disclosure order until notice and hearing were provided, no such prohibition could ever occur, for the party could make any desired disclosures pending the hearing on the prohibition.

Thus, given the important governmental interest in preventing endangerment of health, *see, e.g., Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U.S. 594

---

[17] This presumes that the bill will be changed to reflect our recommendation to make the magistrate's non-disclosure order merely advisory.

156

(1950) (allowing seizure without a predeprivation hearing where necessary to protect the public from misbranded drugs), in apprehending and convicting criminals, *see, e.g., Fuentes* v. *Shevin*, 407 U.S. 67, 93–94 n.30 (1972), and in preserving and discovering the evidence of crimes, *see, e.g., id.*, the government's ability to prohibit disclosure of a summons *ex parte* under the circumstances provided for in the proposed bill seems well grounded.

The bill contains another non-disclosure provision that merits brief attention as well. Section 1(f)(2) prohibits disclosure of a summons whenever the FBI Director, a Special Agent, or designated Assistant Special Agents-In-Charge certify that the summons was issued for the purpose of collecting positive foreign intelligence or counterintelligence. This Office believes that this section also satisfies the due process requirements of the Constitution. The liberty interest of the summoned party is the same as in § 1(f)(1). And although the application of the prohibition against disclosure is not subject to judicial supervision under this subsection, the factual predicate for prohibition is very narrow and specific and the possibility of wrongful deprivation seems very slim. Moreover, the government's interest in excluding judicial participation at the point of the initial determination of prohibition in this case seems very strong, insofar as the foreign intelligence interests of the United States require that as few people as possible be aware of ongoing intelligence operations. Finally, it is clear that national security is an important governmental interest that can justify the delay of an available hearing until after the deprivation of a protectible interest. *See, e.g., Stoehr* v. *Wallace*, 255 U.S. 239, 245 (1921); *Central Union Trust* v. *Garvan*, 254 U.S. 554, 566 (1921).

Section 1(f)(2), moreover, presents no *Brimson* problem, for none of the executive officers designated to act has the power to enter any kind of enforceable order, and, therefore, no non-Article III official is empowered to perform any such inherently judicial function.[18] The officials certify a summons as being for the purpose of collecting foreign intelligence and then a self-operative statutory prohibition takes effect. Violation of this prohibition presumably can be punished only by virtue of judicial process.

One problem with the proposed bill, however, is that it specifies no penalties for violating the statutory prohibition contained in § 1(f)(2). This deficiency should be rectified before submitting the bill to Congress.

## III. Subpoena *Duces Tecum*

Section 1(e)(2) states that "[n]o summons shall require the production of any materials, if such materials would be protected from production under the standards applicable to a subpoena duces tecum entered in aid of a grand jury investigation." The inclusion of this provision is somewhat curious insofar as

---

[18] There is a distinction between certifying a fact that triggers a statutory prohibition that is enforceable by judicial process and entering a judicial order enforceable by criminal contempt after determining a case or controversy The latter is inherently a judicial function and must, according to *Brimson*, be undertaken only by an Article III tribunal.

one of the avowed purposes of proposing the legislation is to allow the FBI greater scope in locating fugitives for the purposes of turning them over to state and local authorities and in gathering data for foreign intelligence purposes, rather than for purposes of federal investigation and indictment. Since it would normally be considered improper to use a grand jury subpoena for such purposes, § 1(e)(2) may be subject to judicial interpretation that could thwart part of the legislative purpose. Accordingly, § 1(e)(2) should be made clearer to ensure that it will not be used to preclude the gathering of information for locating fugitive felons and conducting foreign intelligence functions.

## Conclusion

For the above reasons, we conclude that the provisions of §§ 1(d)(3) and 1(f)(1) require modification to ensure the statute's constitutionality. The insertion we propose which treats a magistrate's order as a recommendation for the district judge for the purposes of the Act should, we believe, satisfy this objection. In addition, § 1(f)(2), providing for nondisclosure in the context of a summons for positive foreign intelligence or counterintelligence information, should specify a legal method of enforcement. Finally, the reference to the grand jury standard in § 1(c)(2) seems contrary to the avowed purpose of the bill without further explanation.

DOUGLAS W. KMIEC
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

158