**UNITED STATES of America, Plaintiff,**

v.

**Christopher V. McCRICKARD, Defendant.**

**CR. S–96–0295–PAN.**

United States District Court, E.D. California.

Dec. 6, 1996.

---

**1150**

Nancy L. Simpson, Assistant United States Attorney, Gold River, CA and Darrell C. Martin, Certified Student, Misdemeanor Unit, United States Attorney's Office, Sacramento, CA, for Plaintiff.

Timothy L. Zindel, Assistant Federal Defender, Sacramento, CA, for defendant. No objection or notice of appeal was taken.

## MEMORANDUM OF DECISION

NOWINSKI, United States Magistrate Judge.

Effective October 19, 1996, Congress provided that, when specially designated to exercise such jurisdiction by the district court, a magistrate judge [1] may try persons ac-

cused of an infraction, class C misdemeanor or class B misdemeanor involving a motor vehicle offense without the defendant's consent. Pub.L. 104–317, §§ 210–202, amending 18 U.S.C. § 3401 and 28 U.S.C. § 636(a). An infraction is an offense punishable by imprisonment for no more than five days and a $5,000 fine. 18 U.S.C. §§ 3571(b)(7), 3581(b)(9). A class C misdemeanor is punishable by imprisonment for up to 30 days and a $5,000 fine. 18 U.S.C. §§ 3571(b)(6), 3581(b)(8). A class B misdemeanor is punishable by imprisonment for up to six months and a $5,000 fine. 18 U.S.C. §§ 3571(b)(6), 3581(b)(7). All class B and class C misdemeanors and infractions are defined as petty offenses by 18 U.S.C. § 19.[2] Before the amendment, a magistrate could try such offenses only with the defendant's consent given after the magistrate "carefully explain[ed]" the defendant's right to trial, judgment and sentencing by a district judge. As before, on its own motion or the motion of the government, a district judge may order that the proceedings be conducted before him but the defendant no longer may obtain trial by a district judge by withholding consent to trial by the magistrate. 18 U.S.C. § 3401(f). As before, an appeal lies from the judgment of the magistrate to a district judge. 18 U.S.C. § 3402.

In this proceeding, defendant was convicted upon his plea of guilty to violating 18 U.S.C. § 13 by driving on McClellan Air Force Base with knowledge his driver's license was revoked, a violation of Cal.Veh. Code § 14601.2(a). On June 21, 1996, I sentenced defendant to six months' imprisonment. Defendant appealed the judgment and sentence to Judge Karlton. While on appeal, the parties agreed that the magistrate who arraigned defendant on September 12, 1995, had not explained defendant's right to trial, judgment and sentencing by a dis-

---

**1.** Hereafter I refer to "magistrates" wherever the judicial officer involved exercised like authority.

**2.** Before 1984, petty offenses were defined by 18 U.S.C. § 1 as offenses "the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $5,000 for an individual and $10,000 for a person other than an individual, or both." 18 U.S.C. § 1, repealed

Pub.L. 98–473, Title II, § 218(a)(1), Oct. 12, 1984, 98 Stat. 2027. Congress passed the original version of this provision in 1930 intending to create a class of minor offenses triable by commissioners, but the companion legislation authorizing trial by commissioners failed to pass. *See Duke v. United States*, 301 U.S. 492, 57 S.Ct. 835, 81 L.Ed. 1243 (1937).

trict judge and stipulated that the judgment and sentence be vacated. Defendant appeared again on October 24, 1996, when plaintiff filed a superseding information. Defendant then contended that the amendment eliminating the requirement that defendant consent to be tried by a magistrate did not apply to this proceeding and, in any event, that it was unconstitutional. Briefs were invited and defendant's contentions are now submitted for decision.

The judicial power of the United States is vested in the Supreme Court and such inferior courts as Congress has established. U.S. Const. Art. III, § 1. The judges of the Supreme Court and inferior courts hold their offices during good behavior and their compensation cannot be diminished while in office. *Id.* These constitutional guarantees are "the bulwarks of independence of the federal judiciary against reprisal, fear of reprisal or undue influence from any quarter and particularly from the other branches of the federal government." *Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037, 1039 (7th Cir.1984). They mirror the colonists' complaint in the Declaration of Independence that King George III "made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries."[3] Magistrates are appointed for eight-year terms. 28 U.S.C. § 631(e). By statute Congress has provided that the salary of a magistrate shall not be reduced during the term in which he is serving; although undisturbed for nearly 30 years, that statute is not immune from repeal. 28 U.S.C. § 634(b); *Glidden v. Zdanok,* 370 U.S. 530, 534, 82 S.Ct. 1459, 1464, 8 L.Ed.2d 671 (1962).

■ The life tenure and salary guarantee of judges appointed pursuant to Article III serve two functions. First, they "structurally" insulate the judiciary from encroachment by the other two branches of government by prohibiting retaliatory legislation that reassigns traditional federal judicial business to legislative judges that do not have life tenure and guaranteed compensation and, therefore, are less independent. *Northern Pipeline Construction Co. v. Marathon Pipe Line Company,* 458 U.S. 50, 58–60, 102 S.Ct. 2858, 2864–66, 73 L.Ed.2d 598 (1982). The recent amendment does not implicate structural concerns because the jurisdiction conferred may be exercised only upon the designation of district judges, who indisputably have the requisite constitutional guarantees; thus, any threat to the independence of a magistrate judge comes from within, not from without the judiciary, and is of no constitutional concern. *See Peretz v. United States,* 501 U.S. 923, 937, 111 S.Ct. 2661, 2669, 115 L.Ed.2d 808 (1991).

■ The Article III attributes also create a personal right to trial by a judge with freedom from possible coercion or influence by the executive or legislative branches of government. *Peretz v. United States,* 501 U.S. 923, 930 n. 6, 111 S.Ct. 2661, 2666 n. 6, 115 L.Ed.2d 808 (1991); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 16, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). Under the former law, this right—as nearly any other—could be waived, once "carefully explained" (whatever that may mean short of a risky historical précis), by the defendant's written consent to proceed before a magistrate. Defendant argues that the effect of the recent amendment is unconstitutionally to deprive defendant of the right. The amendment does not deprive defendant of any constitutionally protected right because (1) there is no right to trial of a crime committed on property under federal legislative jurisdiction by an Article III judge and (2) there is no right to trial of any petty offense by an Article III judge.

In *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), the Court upheld legislation creating inferior federal courts without tenure and salary guarantees in the District of Columbia with authority to enforce *local* federal criminal law. Congress was not conferring federal judicial power under Article III to make laws of national application but, rather, exercising its enumerated power under Article I, § 8, ¶ 17[4]

---

3. English judges who tried serious crimes by jury had tenure and salary guarantees; the complaint was that judges in America did not. See text *infra.*

4. "The Congress shall have the power ... [t]o

to legislate in the District of Columbia by creating courts without Article III judges, just as in most of the 50 states the criminal law is enforced by judges without tenure and salary guarantees. *See Northern Pipeline, supra.* The same constitutional provision confers precisely the same power upon Congress to create inferior courts to try cases arising upon federal property where Congress enjoys exclusive or concurrent legislative jurisdiction comparable to the general legislative jurisdiction of the states.[5] McClellan Air Force Base is such a place.

But sections 3401 and 636(a) apply to *all* class B and class C misdemeanors and infractions, not just those committed on federal property like the District of Columbia.[6] Still,

there is no constitutional impediment. The following précis of English common law from Frankfurter & Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury,* 34 Harvard Law Review, June 1926, is instructive.

By the 14th century it was already an Englishman's "ancient prerogative" to be tried for tippling at the inn or murder by a jury of twelve laymen standing between the accused and the King's vengeance. The protection was at the cost of delay and inconvenience of the call upon the public for petit juries multiplied by steady increase in the criminal statutes. Annual sessions courts were required to meet quarterly to keep pace but the burden proved unbearable.[7] In re-

exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings." U.S. Const., Art. I, § 8, cl. 17.

5. The United States obtained title to all public land in California by the Treaty of Guadalupe Hidalgo in 1848; the treaty did not disturb title to private land. Upon admission to the Union, California obtained legislative jurisdiction over all land except land the federal government expressly reserved therefrom. *See Fort Leavenworth v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). The United States may have exclusive, concurrent, or no legislative jurisdiction over any property. The United States may retain or acquire legislative jurisdiction over property within a state by (1) reserving it upon granting statehood; (2) purchase with consent of the state; or (3) cession. The terms of the reservation, purchase, or cession agreement govern allocation of jurisdiction between the federal government and the state. Absent express terms, jurisdiction is determined by presumptions in force at the time of the property's acquisition. It is presumed that the United States has acquired exclusive federal jurisdiction to property acquired before 1940; since 1940 it is presumed the United States has acquired no jurisdiction. In 1981, the United States owned 47 million acres or 47 percent of California. Twenty million acres were administered by the Forest Service, 16 million acres by the Bureau of Land Management, 4.7 million acres by the Defense Department and 4.5 million acres by the National Park Service. *See* Haines, *Crimes Committed on Federal Property—Disorderly Jurisdictional Conduct,* Criminal Justice Journal, Spring 1981. Wherever within this area the United States has

exclusive or concurrent jurisdiction, the situation is the same as in the District of Columbia.

6. Many petty offenses are charged under the Assimilative Crimes Act, 18 U.S.C. § 13, and such offenses are federal offenses only by virtue of the exclusive or concurrent jurisdiction of the United States. *See* 18 U.S.C. § 7. Some petty offenses are simply part of the general federal criminal code. New sections 3401 and 636(a) apply to the latter no matter where committed. *See* 18 U.S.C. §§ 41 (hunting, fishing, or trapping on wildlife refuges), 42 (importation of injurious animals), 46 (transportation of water hyacinths). Still other petty offenses are created by regulation promulgated by heads of federal agencies that manage federal property, e.g., GSA and the Departments of Interior, Agriculture, and Defense, whether under exclusive or concurrent federal jurisdiction or not. *See, e.g.,* 36 C.F.R. Parts 1–7 (National Park Service regulations); 41 C.F.R. §§ 101–20.003 (GSA regulations).

7. In the early 19th century there were three kinds of law in England: common law, equity, and church or canon law. Three great London courts heard common law cases: King's Bench heard criminal matters, the Exchequer heard monetary disputes such as customs and fines owed the Crown and Common Pleas heard civil disputes between two citizens. The judges of King's Bench and Common Pleas were called lord chief justices; the judges of Exchequer were called barons; they sat at Westminster Hall in the Houses of Parliament. They held court during four "terms" or "sessions" at Michaelmas (November 2–25), Lent or Trinity (May 22–June 12), Easter (April 15–May 8) and Hilary (January 11–13). Appeals were taken to the Court of the Exchequer Chamber consisting of the judges of the two common law courts not involved. The House of Lords acted as the Supreme Court. The times between were called "vacation" when

sponse, new penal statutes expressly provided for conviction by magistrates without a jury. The Crown prosecuted without a jury before a magistrate laws relating to liquor, trade and manufacture, labor, smuggling, traffic on the highway, the Sabbath, cheats, gambling, swearing, small thefts, assaults, offenses to property, servants and seamen, vagabondage and disorderly conduct. The miscreant who abstained from church on the Sabbath paid one shilling to the use of the pious poor; bribery of an excise officer subjected the offender to a penalty of five hundred pounds (likely $50,000–100,000 today)[8] with confinement at hard labor until paid. The gamekeeper who poached on the side risked three months in jail; the servant assaulting his master was incarcerated for a year.

The colonists brought with them this 200–year history of summary jurisdiction of English magistrates over at least 350 statutes that expressly withheld trial by jury and prohibited conduct as serious as burning houses at night; if there was a unifying feature of such statutes it was not the intrinsic gravity of the offense but the legislative judgment that a swift and convenient remedy was necessary.

The colonists' original wilderness settlements did not reproduce magisterial powers required by the elaborate criminal codes and central government in England; further, the settlers could not pay large fines and could not afford to keep productive persons long in jail. The first colonists thus initially entrusted fewer matters to magistrates than did English law. By example, in 1647 a Massachusetts statute empowered magistrates to hear without jury all offenses for which the maximum punishment was forty shillings (perhaps $400) or ten stripes in default. But subsequent statutes extended the jurisdiction of the magistrate to offenses carrying penalties of 20 pounds ($4,000) and six months' imprisonment. Economic success and a succession of new settlers bringing contemporary English practice in time again enlarged the magistrates' share of the criminal law.

By the late 18th century, the struggle with the Crown had made "legalists" of the Framers. The Constitutional Convention explicitly recognized the question whether Article III should provide the trial of "all crimes" or of "all criminal offenses" be by jury. In deference to the Englishman Blackstone, who understood "criminal offenses" to include petty offenses whereas "crimes" meant only serious offenses requiring trial by jury, the Convention chose, without debate, to accord the right only to "crimes" and not petty offenses.

some of the judges went circuit-riding and held the assizes hearing civil and criminal cases too grave for local magistrates, such as capital cases. The assizes were supposed to be held twice a year and were occasions of considerable ceremony. In the meantime, a magistrate, commissioned by the King, maintained local peace by appointing constables, dispensing summary justice for minor offenses sitting four times a year with his fellow magistrates in the county at "quarter sessions" to decide more serious matters. In the county magistrates were usually unpaid gentry such as a squire (a term of courtesy for a member of the gentry whose family had lived for generations in an area and who had tenant farmers on his property) or clergyman. In order to cope with a greater volume of crime in the cities, they were put on salary there. Pool, Daniel, *What Jane Austen Ate and Charles Dickens Knew*, Simon & Shuster, New York, 1993.

8. A pound (a "sovereign" coin or one-pound note or "quid") contained 20 shillings (five shillings was a "crown") and each shilling (a "bob") contained 12 pence ("penny" or "copper"); ¼ pence was a "farthing." Because we do not buy the same things, the purchasing power of that currency is difficult to reckon but estimates have put one pound at as much as $200. Pool, Daniel, *What Jane Austen Ate and Charles Dickens Knew*, Simon & Shuster, New York, 1993. In 1793 a farm laborer outside London lived on £10 a year. A fortunate schoolmaster received £12 a year. A naval midshipman received £6 a year. The captain of a frigate received 8s per day; the captain of a first-rate ship of the line received £365 a year; the first lord of the admiralty received £3,000 a year. The Bellerophon, a 74–gun, 16,000 ton, third-rate ship of the line completed in October 1786 cost £30,232 14s 4d to build. She required 3,000 oak trees which required clearing 50 acres of forest, 10,000 yards of canvas weighing six tons; the iron bars required to forge her four-ton anchor cost £550. Prices rose during the war but a 32–gun frigate could be had for £9,954 in 1794; a 16–gun brig for £5,332 in 1796. Pope, Dudley, *Life in Nelson's Navy*, Naval Institute Press, Annapolis, 1981. Fifty oranges could be bought for 15–18d. Pool, Daniel, *What Jane Austen Ate and Charles Dickens Knew*, Simon & Shuster, New York, 1993.

Similarly, while the Framers considered good behavior tenure and guaranteed salary crucial to the independence of Article III judges, there is no evidence they believed such guarantees extended to magistrates with the power to try petty offenses. Doub & Kestenbaum, "Federal Magistrates for the Trial of Petty Offenses: Need and Constitutionality," 107 *University of Pa.L.Rev.* 453, 456 (1959). In late eighteenth century England, judges presiding over jury trials held office "during good behavior;" but the magistrates, who tried petty offenses without a jury, held office only "during the King's pleasure." *Id.* at 457. Shortly after Independence, most states followed this practice by providing in their constitutions for good-behavior tenure for all judges while maintaining the jurisdiction of magistrates to hear petty offenses. *Id.* at 458. Several state constitutions explicitly distinguished between tenure provisions for judges and magistrates. *See, e.g.,* 1 Poore, Constitutions and Charters 968 (Massachusetts Constitution of 1780 providing life tenure for "all judicial officers" and seven-year terms for magistrates), 1290 (New Hampshire Constitution of 1784 providing life tenure for "all judicial officers" and five-year terms for magistrates).

■ It is now well-established that some constitutional rights do not attach to some offenses. Notwithstanding that the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial by an impartial jury" there is no right to jury trial if the defendant is not in peril of imprisonment for more than six months. *Duncan v. Louisiana,* 391 U.S. 145, 157, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968). The reason is that the English tradition inherited by the federal judicial power did not provide for the right and the Framers assumed, when drafting Article III and the Sixth Amendment, that federal practice would continue to observe the common law distinction between felonies and petty offenses. By like reasoning there is no right to trial of a petty offense by an Article III judge.

It might be argued that Article III, by vesting "the judicial power" of the United States in judges with tenure and salary guarantees, obliterated the common law distinctions between judges and magistrates. But Supreme Court decisions foreclose resolution of Article III claims by "conclusory reference to the language of Article III." *Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 847, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986). In this instance there is exceptionally good reason not to attribute too plain a meaning to the words "the judicial power." There is sound precedent for reading common law distinctions into the language of Article III, e.g., the Article III, section 3 guarantee of a jury trial for "all crimes" does not embrace petty offenses. *Duncan v. Louisiana, supra.* There is also historical evidence that the words "the judicial power" did not refer to the traditional power of magistrates to try minor offenses. The Massachusetts and New Hampshire constitutions, for example, conferred life tenure upon *"all judicial* officers" while giving magistrates only fixed-year tenure; if magistrates were not among "all judicial officers" there is no reason to think they exercised "the judicial power." *See* Poore, Constitutions and Charters, *supra.* Similar usages persisted long beyond the Framers' time. In *Shafer v. Mumma,* 17 Md. 331 (1861), the Maryland Supreme Court held that the state constitutional provision vesting the "judicial power" in judges did not prevent a mayor from trying and fining a prostitute under a local ordinance. In *State v. Young,* 3 Kan. 445 (1866), the Kansas Supreme Court upheld the jurisdiction of a municipal court to try violations of alcohol ordinances because such jurisdiction was not included within the "judicial power" conferred by statute on other courts. *See also* Doub & Kestenbaum, *supra,* at 458 n. 74. Assuming the Framers employed the usage of "the judicial power" current in the period 1776 to 1787 (revolution to ratification), it follows that Congress may constitutionally empower magistrate judges to try petty offenses and that defendants charged with petty offenses have no personal right to an Article III judge.

Given the historical evidence that the Framers distinguished between the constitutional rights of defendants charged with felonies and petty offenses, there is no reason to think that the Constitution places any limits

on Congress' capacity to confer jurisdiction on magistrates to try petty offenses. Nor is there room left to debate what is a "petty offense." *See* 18 U.S.C. § 19; *Duncan v. Louisiana, supra.* Congress was certainly aware of the constitutional issues posed by amendment of 18 U.S.C. § 3401 and 28 U.S.C. § 636(a) and it resolved them by reference to Supreme Court precedent and historical practices previously described. Senate Report No. 104–366, September 9, 1996. Congress' views and intent are entitled to great respect and its enactments are not to be struck down lightly. I therefore conclude that 18 U.S.C. § 3401 and 28 U.S.C. § 636(a) are well within constitutional bounds.

█ Defendant also contends that even if the amendments to sections 3401 and 636(a) are constitutional, they do not apply to this proceeding because "retroactive" application is barred by *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). *Landgraf* establishes a "default" presumption against retroactive application of statutes, but jurisdictional rules are excepted. *Id.* As the amendments simply transfer jurisdiction to magistrates without depriving defendant of right to trial by an independent judicial officer, the amendments apply to this proceeding.

Accordingly, defendant's request for trial by a district judge is denied.