# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-31265

United States Court of Appeals
Fifth Circuit

**FILED**

April 14, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

DAVID W. HOLLINGSWORTH,

      Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

A federal magistrate judge tried defendant-appellant David W. Hollingsworth ("Hollingsworth") for a petty offense committed on a federal enclave.[1] The magistrate judge conducted a bench trial, entered a verdict of guilty, and sentenced Hollingsworth to six months in federal prison.

---

[1] The federal magistrate judge was authorized to hear Hollingsworth's case under 18 U.S.C. § 3401(b) (giving magistrate judges jurisdiction over trials for petty offenses), and under 28 U.S.C. § 636(a)(1) and (3) (conferring powers and duties of former United States commissioners upon federal magistrate judges, and authorizing magistrate judges to conduct trials under 18 U.S.C. § 3401). *See also* Fed. R. Crim. P. 58(b)(E) (requiring magistrate judge to notify defendant of right to trial, judgment, and sentencing before district judge unless charge is a petty offense).

No. 13-31265

Hollingsworth appealed to the federal district court.[2] The district court affirmed the judgment and sentence entered by the magistrate judge.[3] Hollingsworth now appeals to this court.[4] For the reasons explained below, we AFFIRM the judgment of the district court.

## FACTS AND PROCEEDINGS

Hollingsworth was charged with violating 18 U.S.C. § 113(a)(5), a petty offense,[5] at the Naval Air Station Joint Reverse Base New Orleans, a military base located in Belle Chasse, Louisiana ("Belle Chasse"). It is uncontested that Belle Chasse is a federal enclave under U.S. CONST. Art. I, § 8, cl. 17 ("Clause 17"),[6] and § 113 is effective on such enclaves. *See* 18 U.S.C. § 113(a) (providing that law applies "within the special maritime and territorial jurisdiction of the United States"). Hollingsworth objected to trial before the federal magistrate judge, but the magistrate judge held that she had jurisdiction to try Hollingsworth without his consent. Hollingsworth appealed his conviction to

[2] Hollingsworth was required to appeal first to the district court under 18 U.S.C. § 3402. *See also* Fed. R. Crim. P. 58(g)(2)(B) (authorizing defendant to appeal magistrate judge's judgment of conviction and sentence to district court).

[3] *See* Rule 58(g)(2)(D) (providing that district court's review "is the same as in an appeal to the court of appeals from a judgment entered by a district judge").

[4] This court has held that we have jurisdiction to hear appeals of this kind under 28 U.S.C. § 1291. *See United States v. Hughes*, 542 F.2d 246, 248 n.3 (5th Cir. 1976); *see also United States v. Peck*, 545 F.2d 962, 964 (5th Cir. 1977) (hearing appeal of this kind without discussing basis for jurisdiction); *United States v. Forcellati*, 610 F.2d 25, 28 (1st Cir. 1979) (explaining that circuit courts to consider issue have held that jurisdiction exists under § 1291).

[5] Hollingsworth concedes that his crime is a petty offense. *Compare also* 18 U.S.C. § 113(a)(5) (imposing a maximum six month sentence of imprisonment on any person who commits a "[s]imple assault" on a person sixteen years of age or older), *with id.* § 3559(a)(7) (defining Class B misdemeanor as crime for which maximum term of imprisonment is six months or less), *and id.* § 19 (defining petty offense to include Class B misdemeanors).

[6] Clause 17 gives Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever" over the District of Columbia and "to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

No. 13-31265

the district court, arguing that he had a right to a jury trial. The district court affirmed the conviction and sentence entered by the magistrate judge.

## STANDARD OF REVIEW

We apply the same standard of review used by the district court. *Peck*, 545 F.2d at 964 ("In our review we apply to the magistrate the same standard used by the district court."). Thus we review the magistrate judge's findings of fact for clear error and conclusions of law de novo. *Compare* Fed. R. Crim. P. 58(g)(2)(D) (providing that district court's review of magistrate judge's judgment "is the same as in an appeal to the court of appeals from a judgment entered by a district judge"), *with Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 654 (5th Cir. 2012) ("In an appeal from a district court's final judgment following a bench trial, we review the district court's findings of fact for clear error and review conclusions of law de novo.").

## DISCUSSION

### I.

### A.

Hollingsworth now argues for the first time that he has a constitutional right to trial before an Art. III judge.[7] The Government argues that, because Belle Chasse is a federal enclave, Hollingsworth does not have a right to trial before an Art. III judge.

In *Palmore v. United States*, 411 U.S. 389 (1973), the Supreme Court held that "Congress [is] not required to provide an Art. III court for the trial of criminal cases arising under its laws applicable only within the District of

---

[7] Because challenges to a court's subject matter jurisdiction can never be forfeited or waived, *see Union Pac. R.R. Co. v. Bhd. Of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 81 (2009), Hollingsworth may raise this challenge here even though he failed to raise it before the district court.

No. 13-31265

Columbia." *Id.* at 410.[8] Hollingsworth was tried for the violation of a federal criminal statute that applies only "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 113(a)(5). Thus under *Palmore*, Hollingsworth has no constitutional right to trial before an Art. III court. *See Jenkins*, 734 F.2d at 1326 (holding that "the requirements of Article III are consistent with the establishment by Congress of non-Article III courts to enforce federal criminal laws" in Clause 17 federal enclaves).

Hollingsworth also argues that, even if Congress could refer his trial to an Article I court under Clause 17, the magistrate judge who heard his case is not a member of such a court. But Congress "exercise[s] within [federal enclaves] all legislative powers that the legislature of a state might exercise within the State, and may vest and distribute the judicial authority in and among courts and magistrates, and regulate judicial proceedings before them, as it may think fit, so long as it does not contravene any provision of the constitution of the United States." *Palmore,* 411 U.S. at 397 (quoting *Capital Traction Co. v. Hof,* 174 U.S. 1, 5 (1899)). Hollingsworth fails to cite any constitutional provision that Congress violated when it referred his trial to a federal magistrate judge. Indeed, the particular facts of Hollingsworth's case show that, as applied, Congress has not even entered the constitutional borderlands. Pursuant to Clause 17, Congress could have referred all trials for crimes committed at Belle Chasse to an Article I judge, including felony trials.

---

[8] Hollingsworth argues that "[i]t is not clear" that this principle from *Palmore* applies to Clause 17 federal enclaves like Belle Chasse. But in *Paul v. United States*, 371 U.S. 245 (1963), the Supreme Court stated that "[t]he power of Congress over federal enclaves that come within the scope of [Clause 17] is obviously the same as the power of Congress over the District of Columbia." *Id.* at 263. Nothing in *Palmore* or later cases abrogate the *Paul* Court's unambiguous statement. We hold that we are bound by *Paul* to apply *Palmore* in the present case. *See United States v. Jenkins*, 734 F.2d 1322, 1325-26 (9th Cir. 1983) ("Because clause 17 does not distinguish between the District of Columbia and other federal enclaves, we find *Palmore* indistinguishable from the instant case and controlling." (citing *Paul,* 371 U.S. at 263)).

4

No. 13-31265

*See Palmore*, 411 U.S. at 391 (explaining that Palmore was tried and found guilty of a felony in an Article I court). But Congress chose to refer only trials for petty offenses to federal magistrate judges. Moreover, it is not clear that Hollingsworth has a constitutional right to appeal to an Art. III court, yet Congress granted him the right to appeal to not one but two Art. III courts.

We hold that Hollingsworth did not have a right to trial before an Art. III judge, and that his trial, conviction, and sentence before a federal magistrate judge was constitutional. Because we are bound "never to anticipate a question of constitutional law in advance of the necessity of deciding it," *United States v. Raines*, 362 U.S. 17, 21 (1960), our holding applies only to defendants tried for petty offenses committed on federal enclaves obtained by Congress pursuant to Clause 17.[9]

B.

In response to the dissent, we begin by noting a historical fact that the dissent passes over. From 1894 until 1948, Congress referred trials for misdemeanors committed on certain federal lands to the federal magistracy.[10]

---

[9] We refer to petty offenses only to show that Congress acted well within its constitutional power under Clause 17. We do not decide the distinct question whether all trials for petty offenses fall outside the scope of Art. III.

[10] Most of the statutes referring misdemeanor trials to the federal magistracy relate to the national parks. *See* Act of May 7, 1894, ch. 72, § 5, 28 Stat. 73, 74 (giving commissioner in Yellowstone National Park jurisdiction "to issue process in the name of the United States for the arrest of any person charged with the commission of any misdemeanor . . . , and to try the persons so charged, and, if found guilty, to impose the punishment and adjudge the forfeiture prescribed"); Act of Aug. 22, 1914, Pub. L. No. 63-177, § 6, 38 Stat. 699, 700-01 (giving same jurisdiction to Glacier National Park commissioner); Act of June 30, 1916, Pub. L. No. 64-124, § 6, 39 Stat. 243, 245 (giving same jurisdiction to Mount Rainier National Park commissioner); Act of Aug. 21, 1916, Pub. L. No. 64-223, § 6, 39 Stat. 521, 523 (giving same jurisdiction to Crater Lake National Park commissioner); Act of June 2, 1920, Pub. L. No. 66-235, §§ 7-8, 41 Stat. 731, 733-34 (giving same jurisdiction to Yosemite, Sequoia, and General Grant National Park commissioners); Act of Apr. 25, 1928, Pub. L. No. 70-317, § 6, 45 Stat. 458, 460 (giving same jurisdiction to Mesa Verde National Park commissioner); Act of Apr. 26, 1928, Pub. L. No. 70-320, § 6, 45 Stat. 463, 464-65 (giving same jurisdiction to Lassen Volcanic National Park commissioner); Act of Mar. 2, 1929, Pub. L. No. 70-1009, § 6, 45 Stat. 1536, 1538 (giving same jurisdiction to Rocky Mountain National Park commissioner); Act of

The statutes referring such trials did not require the defendant's consent as a prerequisite to the magistrate's jurisdiction. *See* statutes cited *supra note* 10. This fact is relevant for two reasons. First, it shows that the dissent is wrong to claim that the federal magistracy has always been an "adjunct body," "statutorily, historically, and doctrinally" (footnotes omitted). Second, the Supreme Court's non-delegation caselaw requires us to consider historical context and practice when construing the "literal command of Art. III." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64 (1982) (plurality opinion); *see also NLRB v. Canning*, 134 S. Ct. 2550, 2560 (2014) (holding that historical practice is important when courts interpret the Constitution, "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era"). We have not found evidence that a defendant tried under the statutes referring misdemeanor trials to commissioners *ever* challenged the constitutionality of

---

Apr. 19, 1930, Pub. L. No. 71-157, § 6, 46 Stat. 227, 228 (giving same jurisdiction to Hawaii National Park commissioner); Act of Aug. 19, 1937, Pub. L. No. 75-322, § 5, 50 Stat. 700, 702 (giving same jurisdiction to Shenandoah National Park commissioner); Act of Mar. 6, 1942, Pub. L. No. 77-478, §§ 3, 5, 56 Stat. 133, 133-35 (giving Isle Royale National Park commissioner jurisdiction to try and sentence defendants for "violation[s] of the [park's] rules and regulations," which were misdemeanors and could result in a sentence of up to six months of imprisonment); Act of Apr. 29, 1942, Pub. L. No. 77-533, §§ 3, 5, 56 Stat. 258, 259-60 (giving commissioner in Great Smoky Mountains National Park same jurisdiction as Isle Royale commissioner); Act of Apr. 23, 1946, Pub. L. No. 79-356, § 2, 60 Stat. 119, 119-20 (giving commissioner in Sequoia National Park jurisdiction to try and sentence defendants for "commission within [Kings Canyon National P]ark of a petty offense against the law"). But Congress also extended limited petty crimes jurisdiction to commissioners in certain federal enclaves beyond the national parks. *See, e.g.*, Act of Apr. 20, 1904, Pub. L. No. 58-124, § 6, 33 Stat. 187, 188 (giving commissioner in Hot Springs Mountain Reservation jurisdiction to try and sentence defendants for any misdemeanor "or other like offense" when prescribed punishment "d[id] not exceed a fine of one hundred dollars"). At least one statute authorized general-duty commissioners, sitting as adjuncts to a federal district court, to conduct misdemeanor trials arising in a neighboring federal enclave. *See* Act of Sept. 1, 1916, Pub. L. No. 64-250, 39 Stat. 676, 693 (giving "nearest United States commissioner for the District of Maryland" jurisdiction to try and sentence defendants for moving-vehicle offenses committed on Conduit Road, now called MacArthur Boulevard, when prescribed punishment did not exceed a fine of $40).

the delegation. Indeed, in the only case we have identified addressing a commissioner's jurisdiction to hear a misdemeanor case under such a statute, neither the defendant nor the court saw fit to even raise the issue. *See Rider v. United States*, 149 F. 164, 166-67, 170 (8th Cir. 1906) (vacating defendant's misdemeanor conviction because he was tried before general commissioner, instead of commissioner specifically appointed to hear cases arising on federal land, as envisioned in statute). The fact that these statutes survived unchallenged for more than half a century ought to inform our constitutional analysis.

We also disagree with the dissent on two theoretical issues. First, the dissent insists that this case involves Art. III "federal judicial power" and proceeds as if this distinction carries the day. The Supreme Court once "suggested a rigid distinction between those subjects that could be considered only in Art. III courts and those that could be considered only in legislative courts." *Marathon*, 458 U.S. at 63 n.14 (plurality opinion). But the Court's "more recent cases clearly recognize that legislative courts may be granted jurisdiction over some cases and controversies to which the Art. III judicial power might also be extended." *Id.*; *see also id.* at 113 (White, J., dissenting) (stating that "[t]here is no difference in principle between the work that Congress may assign to an Art. I court and that which the Constitution assigns to Art. III courts"); *Palmore*, 411 U.S. at 402 (explaining that "the enforcement of federal criminal law" has never "been deemed the exclusive province of federal Art. III courts"). By relying on the outdated notion that federal judicial power can never be assigned to legislative courts, the dissent's reasoning is wrong from the start.

Instead of asking whether this case involves "federal judicial power," the Supreme Court's caselaw makes clear that we should ask a simpler question: whether the case arose in a "geographical area[ ], in which no State operate[s]

as sovereign." *Marathon*, 458 U.S. at 64 (plurality opinion). The Constitution and the Supreme Court's caselaw define these areas. They include United States territories, the District of Columbia ("D.C."), Indian territories, and foreign areas over which the United States has jurisdiction to try American citizens by treaty. *See id.* at 65 & n.16.[11] And, as we explained above, the Supreme Court has left no doubt that the geographical exception applies to all Clause 17 federal enclaves, not just D.C. *See supra* note 8. Because Hollingsworth's crime occurred in a Clause 17 federal enclave, Congress had the power to refer Hollingsworth's trial to a legislative court, regardless of the fact that the magistrate judge exercised federal judicial power that normally resides in the Art. III courts.

Second, the dissent argues that the federal magistracy is an "adjunct body." Of course, the magistrate judge did not act as an adjunct in this case; she exercised full judicial power over Hollingsworth's criminal trial. *See Stern v. Marshall*, 131 S. Ct. 2594, 2610-11 (2011) (explaining that a court that resolves all issues of law and fact, enters final judgment, and is reviewed under ordinary appellate standard "is no mere adjunct of anyone"). Thus the dissent must mean that the federal magistracy *should be* an adjunct body. The dissent's only justification for this argument is its assertion that the federal magistracy is "different in kind from Article I 'legislative courts.'" The dissent fails to explain how the federal magistracy is different in kind, and we discern

---

[11] The exception can also apply to crimes arising on American ships on the high seas or in foreign waters, at least when Congress has expressly given admiralty jurisdiction to a nearby legislative court. *Compare id.* at 74 n.27 (explaining that the Court had recognized Congress's power to confer admiralty jurisdiction on "administrative tribunals"), *with United States v. Flores*, 289 U.S. 137, 149-150 (1933) (holding that United States' admiralty jurisdiction extended not only to the high seas, but also to American vessels in foreign waters).

nothing in the various statutes authorizing legislative courts to justify the claim.

It is true that magistrate judges are appointed by district courts,[12] not by the President with the advice and consent of the Senate, as legislative and territorial judges often are.[13] But magistrate judges are not the only legislative judges appointed by other federal agencies or officers,[14] or even the only ones appointed by Art. III judges.[15] Magistrate judges receive a salary that approaches that of some legislative judges,[16] and exceeds that of others.[17] And magistrate judges' terms of appointment and job protections are similar to those offered to other legislative judges.[18] Magistrate judges have the professional competence and resources found in the legislative courts. We

---

[12] *See* 28 U.S.C. § 631(a) (authorizing appointment of magistrate judges by district courts).

[13] *See, e.g.*, D.C. Code § 11-1501(a) (providing that President appoints judges of the D.C. courts with advice and consent of the Senate); 10 U.S.C. § 942(b)(1) (same for judges of the Court of Appeals for the Armed Forces); 38 U.S.C. § 7253(6) (same for judges of the Court of Appeals for Veterans Claims); 48 U.S.C. § 1614(a) (same for judges of the District Court of the Virgin Islands).

[14] *See, e.g.*, 8 C.F.R. § 1003.1(a)(1) (providing that Attorney General appoints members of Board of Immigration Appeals); 41 U.S.C. § 7105(a)(2), (b)(2)(B) (providing that federal agencies appoint members of the Armed Services and Civilian Boards of Contract Appeals).

[15] Certain Art. III judges may appoint legislative judges to the territorial courts when "necessary for the proper dispatch of the business of the . . . court." 48 U.S.C. § 1614(a) (authorizing certain Art. III judges to appoint members of District Court of the Virgin Islands); *see also id.* at § 1424b(a) (same for Guam); *id.* at § 1821(b)(2) (same for Northern Mariana Islands).

[16] *Compare* 28 U.S.C. § 634(a) (allowing compensation for magistrate judges "equal to 92 percent of the salary of a judge of the district court"), *with, e.g.*, 48 U.S.C. § 1614(a) (setting Virgin Island judges' salary "at the rate prescribed for judges of the . . . district courts").

[17] *Compare* 28 U.S.C. § 634(a) (allowing basic compensation for magistrate judges of about $180,000 as of 2014), *with* 5 U.S.C. § 5372a(b) (setting maximum, basic compensation for highest-paid member of Armed Services and Civilian Boards of Contract Appeals at about $160,000 as of 2015).

[18] *Compare* 28 U.S.C. § 631(e) (setting magistrate judges' term at eight years), *and id.* § 631(i) (allowing removal "only for incompetency, misconduct, neglect of duty, or physical or mental disability"), *with, e.g.*, 10 U.S.C. § 942(b)(2), (c) (setting Court of Appeals for the Armed Forces terms at fifteen years, and allowing removal only for "neglect of duty," "misconduct," or "mental or physical disability"), *and* 48 U.S.C. § 1614(a) (setting Virgin Island District Court terms at ten years, and allowing removal "by the President for cause").

discern no meaningful difference between the federal magistracy and the legislative courts. Indeed, because the federal magistracy's members are appointed by federal judges instead of the President or the President's appointees, we can have greater confidence in federal magistrate judges' ability to fairly exercise federal judicial power and to avoid diminution of the separation of powers. *Cf. Marathon*, 458 U.S. at 63-64 (plurality opinion) (explaining that legislative courts exception to Art. III did not threaten the separation of powers). The "differen[ce] in kind" that motivates our decision is Congress's "plenary authority" over Clause 17 federal enclaves. *Id.* at 75 (explaining that Congress's power over D.C. is "obviously different in kind from other broad powers conferred on Congress" in Article I).

The dissent contends that we overlook relevant Supreme Court opinions. But nothing in the cases the dissent refers to purports to overrule *Palmore*. Because *Palmore* remains good law, we do not understand the dissent's objection to our reliance on it, especially since its relevance here is so obvious.[19] The cases the dissent refers to, including *CFTC v. Schor*, 478 U.S. 833 (1986), have much to say about Congress's attempts to assign a whole area *of law* to legislative courts. *See id.* at 853-54. They have little to say about Congress assigning cases that arise in a special *geographic* area to legislative courts. *Cf. Marathon*, 458 U.S. at 76 (plurality opinion) (explaining that *Palmore* did not mean that Congress could create legislative courts "in every area in which Congress may legislate," only that it could create legislative courts when it exercises plenary power "in limited geographic areas").

The dissent also raises several practical concerns about our decision. The dissent worries that "[f]ederal enclaves are neither few nor small." But the

---

[19] Nor do we understand why the dissent accuses us of "leapfrog logic" for relying on *Paul*. Caselaw aggregates over time, and courts are tasked daily with applying the holdings of cases decided across decades or more.

No. 13-31265

Constitution does not empower us to decide how much federal land is too much. Rather, the Constitution leaves that decision to the Government and the State legislatures. *See* Clause 17 (authorizing Congress to exercise exclusive jurisdiction over lands purchased by Congress for military installations "and other needful Buildings," with "the Consent of the Legislature of the State in which the Same shall be").

The dissent also faults us for failing to identify a "limiting principle" that will restrain Congress from referring "federal criminal felony (even capital) cases that might arise in a federal enclave" to federal magistrate judges. There is no death penalty in D.C., but the legislative courts there frequently try defendants for serious felonies. *See, e.g.*, *McKnight v. United States*, 102 A.3d 284 (D.C. 2014) (upholding defendant's conviction in D.C. Superior Court for first-degree murder). If Congress may refer trials for crimes committed in D.C. to legislative judges, we do not understand why the dissent worries (hypothetically) about that happening in other Clause 17 federal enclaves. Of course, both in D.C. and elsewhere, Congress's power to refer trials to legislative courts may turn on whether the relevant federal statute relates to an issue of national concern, or to "matters of strictly local concern" like local criminal activity. *See Palmore*, 411 U.S. at 405-07.

The dissent contends that our decision will result in absurd consequences. It postulates that, where an oceanside federal enclave abuts state land, "whether a defendant has a right to be tried by an Article III judge will depend on which of the neighboring piers he is standing on." But whenever events occur along jurisdictional borders, courts must engage in jurisdictional line-drawing. To provide only one example, this court once held that the federal courts had concurrent jurisdiction with the state courts "if the crime charged . . . was committed on the ocean below the low-water mark." *Murray v. Hildreth*, 61 F.2d 483, 485 (5th Cir. 1932). It follows that, should a defendant

11

commit a crime at high tide, just *above* the low-water mark, the federal courts could offer him no rescue. Jurisdiction often turns on just such narrow considerations.

## II

Hollingsworth argues that his conviction should be overturned because he was denied the right to a jury trial. But it is well-established that those charged with petty offenses do not have a right to a jury trial. *See, e.g., Lewis v. United States*, 518 U.S. 322, 325-26 (1996) (explaining that there is no right to jury trial for petty offenses, and that crimes with a six month maximum prison term are presumed petty). Hollingsworth concedes that this argument is foreclosed by binding precedent.

We hold that Hollingsworth did not have a right to a jury trial.

## CONCLUSION

For the reasons explained above, we AFFIRM the judgment of the district court.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

With admiration for my colleague's dissent, and while my heart travels in its direction, I concur fully in Judge Clement's opinion. That we are addressing a petty offense is important. A person charged with a petty offense has no right to an indictment,[1] no absolute right to counsel,[2] and no right to a trial by jury.[3] To my eyes, this reality enforces the power of the Congress over federal enclaves and simultaneously limits it.

---

[1] Fed. R. Crim. P. 58(b)(1) ("The trial of a petty offense may also proceed on a citation or violation notice.").

[2] *See Argersinger* v. *Hamlin*, 407 U.S. 25, 37 (1972) ("[A]bsent a knowing and intelligent waiver, no person may be imprisoned for any [petty] offense, . . . unless he was represented by counsel at his trial.").

[3] *Lewis* v. *United States*, 518 U.S. 322, 323-24 (1996).

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

"In all failures, the beginning is certainly the half of the whole."  George Eliot, *Middlemarch* (1874).    The failure I apprehend is incremental reassignment of federal judicial power.    From the first Judiciary Act, magistrates (later "commissioners," presently "magistrate judges") have assisted federal district judges, the primary courts of original jurisdiction in the federal system.[1]  As assistants, the federal magistracy is an Article III adjunct body—joining in aid, indispensably and even magisterially—but always part of, and with delimited Article III jurisdiction and authority.  That

---

[1] *See* Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91 ("[F]or any crime or offence against the United States, the offender may, by any justice or judge of the United States, or by any justice of the peace, or other magistrate of any of the United States where he may be found agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence."); Act of March 2, 1793, ch. 22, § 4, 1 Stat. 333, 334 ("[B]ail for appearance in any court of the United States . . . may be taken by any judge of the United States . . . and by any person having authority from a circuit court, or the district courts of Maine or Kentucky to take bail; which authority . . . may [be] give[n] to one or more discreet persons learned in the law . . . ."); Act of March 1, 1817, ch. 30, 3 Stat. 350 ("[T]he commissioners who now are, or hereafter may be, appointed by virtue of the act, entitled 'An act for the more convenient taking of affidavits and bail in civil causes, depending in the courts of the United States,' are hereby authorized to take affidavits and bail in civil causes, to be used in the several district courts of the United States . . . .").

No. 13-31265

is true statutorily,[2] historically,[3] and doctrinally,[4] and is so constitutionally.

U.S. Const. art. III, § 1 ("The judicial power of the United States shall be vested

---

[2] 28 U.S.C. § 636(b)(4) ("Each district court shall establish rules pursuant to which the magistrate judges shall discharge their duties."); *id.* § 636(b)(1)(B) ("[A] judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court . . . ."); *id.* § 636(c)(4) ("The court may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate judge under this subsection."). *Compare* 18 U.S.C. § 3401(a) ("When specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate judge shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district."), *with id.* § 3401(b) ("Any person charged with a misdemeanor, *other than a petty offense* may elect, however, to be tried before a district judge for the district in which the offense was committed." (emphasis added)).

[3] Indeed, no congressional intent exists until 1996 to support as a constitutionally delegable responsibility the right to fully try federal criminal misdemeanor offenses over a defendant's objection. And no congressional intent exists, *ever, at all,* for using the Enclave Clause of Article I as authority to so empower magistrate judges. *See, e.g.*, *To Abolish the Office of United States Commissioner, to Establish in Place Thereof Within the Judicial Branch of the Government the Office of the United States Magistrate, and for Other Purposes: Hearing on S. 945, H.R. 5502, H.R. 8277, H.R. 8520, H.R. 8932, H.R. 9970, and H.R. 10841 Before the Subcomm. No. 4 of the H. Comm. on the Judiciary*, 90th Cong. 62 (1968) (statement of Warren Christopher, Deputy Att'y Gen. of the United States) ("[T]he performance of judicial functions by the magistrates would be entirely under the control of Article III judges. In fact, the magistrates themselves would function within the judicial branch, as satellite tribunals to the Article III courts."); H.R. Rep. No. 94-1609, at 4 (1976) ("When the Congress enacted the Magistrates Act in 1968 . . . it created a system of full-time and part-time judicial officers who would perform various judicial duties under the supervision of the district courts in order to assist the judges of these courts in handling an ever-increasing caseload."); *id.* at 11 ("The judge is given the widest discretion to 'accept, reject or modify' the findings and recommendation proposed by the magistrate, including the power to remand with instructions. Thus, it will be seen that under subparagraph (B) and (C) the ultimate adjudicatory power over dispositive motions, habeas corpus, prisoner petitions and the like is exercised by a judge of the court after receiving assistance from and the recommendation of the magistrate."); *see also* Linda J. Silberman, *Masters and Magistrates Part II: The American Analogue*, 50 N.Y.U. L. Rev. 1297, 1303-05 (1975) (explaining that the creation of magistrates was prompted by "the need for assistance to judges" and that "[t]he jurisdiction being exercised [by magistrate judges] is clearly that of the article III federal district court, and the article III judge directly controls the magistrate's powers" (footnote omitted)); Admin. Office of the U.S. Courts, *A Guide to the Legislative History of the Federal Magistrate Judges System* 21 (1995) ("The Senate report [regarding the 1976 Amendments to the Federal Magistrates Act] noted that without the assistance furnished by magistrates in handling additional duties for the court, district judges would have to devote a 'substantial' portion of their time to various procedural matters rather than to trying cases.").

No. 13-31265

in one Supreme Court, and in such inferior courts as the Congress may, from time to time, ordain and establish. The judges, both of the Supreme and inferior courts, shall hold their offices during good behaviour; and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office."). For that reason, I do not agree that our federal magistracy is an Article I court system with *Palmore* equivalence to congressional court systems over federal territories and the District of Columbia, available constitutionally, as the majority contemplates,

---

[4] *See, e.g.*, *Wingo v. Wedding*, 418 U.S. 461, 469-70 (1974) (finding that the Federal Magistrates Act did *not* authorize magistrates to hold habeas corpus evidentiary hearings and explaining that "although the Act gives district judges broad authority to assign a wide range of duties to magistrates, Congress carefully circumscribed the permissible scope of assignment to only 'such additional duties as are not inconsistent with the Constitution and laws of the United States'" (quoting 28 U.S.C. § 636(b))); *United States v. Raddatz*, 447 U.S. 667, 681, 683 (1980) (holding that the district court's referral of a motion to suppress to a magistrate did not violate Article III "so long as the ultimate decision is made by the district court," and explaining that "Congress was alert to Art. III values concerning the vesting of decisionmaking power in magistrates. Accordingly, Congress made clear that the district court has plenary discretion whether to authorize a magistrate to hold an evidentiary hearing and that the magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction."); *Gomez v. United States*, 490 U.S. 858, 871-72 (1989) (finding that the Federal Magistrates Act's "additional duties" clause did *not* permit magistrates to conduct jury selection in felony trials without consent and explaining that "the carefully defined grant of authority to conduct trials of civil matters and of minor criminal cases [subject to special assignment, consent of the parties, and judicial review] should be construed as an implicit withholding of authority to preside at a felony trial. The legislative history, with its repeated statements that magistrates should handle subsidiary matters to enable district judges to concentrate on trying cases, and its assurance that magistrates' adjudicatory jurisdiction had been circumscribed in the interests of policy as well as constitutional constraints, confirms this inference." (footnotes omitted)); *Peretz v. United States*, 501 U.S. 923, 937 (1991) (distinguishing *Gomez* on the basis of consent and holding that when a defendant consents, the magistrate has jurisdiction to perform jury selection in a felony trial, finding no Article III structural protections implicated where the district court maintains "total control and jurisdiction" (internal citation and quotation marks omitted)). *See generally Crowell v. Benson*, 285 U.S. 22, 61-65 (1932) (approving statutory regime that allowed the United States Employees' Compensation Commission to make initial fact-finding, but requiring substantial oversight by Article III judges, who must decide "fundamental or jurisdictional facts" de novo).

to exercise federal judicial power outside of Article III, and regardless of party consent.[5]

Instead, I would reiterate that the federal magistracy has been a longstanding adjunct body to Article III "constitutional courts," different in kind from Article I "legislative courts," to use the time-tested distinction set forth by Chief Justice Marshall in *American Insurance Co. v. 356 Bales of Cotton*, 26 U.S. 511, 512 (1828). At least as to constitutional courts whose life tenure and protected salaries give Article III its structural independence, judicial power flows through circuity that is a closed loop. *See* James E. Pfander, *Article I Tribunals, Article III Courts, and the Judicial Power of the United States*, 118 Harv. L. Rev. 643, 672 (2004) ("Article III creates an independent judicial department with a single Supreme Court to which all other federal courts, if any, must remain inferior. The familiar pyramidal shape of the judicial department flows from the combined requirements of unity, supremacy, and inferiority, and precludes Congress from establishing an independent set of courts invested with a portion of the judicial power and free from ultimate oversight in the Supreme Court.").

Notably, Congress has the power not only to make "all laws which shall be necessary and proper for carrying into execution [its own] foregoing powers" (hence laws establishing bankruptcy, immigration, and military tribunals, whose adjudicative powers exist alongside constitutional courts, often reviewed by them), but also, significantly, "all laws which shall be necessary and proper for carrying into execution . . . all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof." U.S. Const. art. I, § 8, cl. 18. Constitutional courts are

---

[5] Supreme Court's precedent, *see, e.g. Baldwin v. New York*, 399 U.S. 66, 68 & n.5 (1970), instructs that persons accused of petty offenses, not considered "crimes" at common law, have no due process right to be tried by a jury of their peers. On that point, I concur.

comprised of "principal officers," and our federal magistracy assisting them is proper congressional objective to effectuate "other powers" reposed in Article III. *See McCulloch v. Maryland*, 17 U.S. 316 (1819).

Finding constitutional birthright in Article I, Section 8, Clause 18's "other powers" phrase—instead of Clause 17's Seat of Government Clause or its Enclave Clause enhancement of Article I powers—enhances Article III courts' discretion to refer matters to the federal magistracy for preliminary review and a recommended decision. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). Indeed, as Congress has revised and expanded matters that may be so referred, the Supreme Court repeatedly has tested each subsequent delegation, when there is no consent, according to one constant principle, namely, that case-dispositive matters may be handled by magistrate judges provided that Article III district courts retain full and ultimate authority "to make an informed, final determination" of the case. S*ee United States v. Raddatz*, 447 U.S. 667, 682-83 (1980). [6]

---

[6] Well-developed non-delegation caselaw has been applied to the distinctive Article III role of our federal magistracy over half a dozen times by the Supreme Court, *see, e.g.*, *supra* note 4, as well as by our court. *See, e.g.*, *United States v. Johnston*, 258 F.3d 361 (5th Cir. 2001) (holding that a consensual delegation of the final judgment in a federal prisoner's motion to vacate conviction or sentence to a magistrate judge violated the Constitution); *Hill v. City of Seven Points*, 230 F.3d 167 (5th Cir. 2000) (holding that a post-consent reference order signed by the district judge was required to vest authority in a magistrate judge for disposition of a summary judgment motion); *Puryear v. Ede's Ltd.*, 731 F.2d 1153 (5th Cir. 1984) (holding that referrals of civil matters to magistrates pursuant to 28 U.S.C. § 636(c) are constitutional "[f]or essentially the reasons stated by our sister circuits"). Yet the majority opinion gives this caselaw of ours no reference, jumping back over half a century of doctrinal turbulence applicable to legislative courts to the Supreme Court's most permissive precedent in *Palmore v. United States*, 411 U.S. 389 (1973). Even making that span, the majority must also use leapfrog logic connecting *Palmore*, a case addressing Congress's creation of an "entirely new court system" in the District of Columbia "with functions essentially similar to those of the local courts found in the 50 States of the Union," 411 U.S. at 409, to a decision a decade earlier, *Paul v. United States*, 371 U.S. 245 (1963), a case addressing California's attempt to enforce price regulations on milk sold at military installations. Second, the majority cites broadly to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (declaring *un*constitutional Congress's broad grant of jurisdiction to bankruptcy judges over all civil proceedings arising under, or arising

No. 13-31265

Section 3401(b)'s diversion of core federal judicial power to try an accused over objection through conviction, and then also to sentence a convicted defendant to prison, subject only to appeals to district judges now reviewing with identical, often considerable, deference given by circuit courts, infringes the "total control and jurisdiction" constitutional courts must exercise over federal criminal trials. *Raddatz*, 447 U.S. at 681-83. As the majority decides, the Article III adjunct has become the Article I judge, at least in any relevant constitutional adjudicatory sense. There may be efficiencies to this arrangement, though the legislative history offers no showing that criminal trials are overburdening constitutional courts. Regardless, the Supreme Court has not shown solicitude to workload as a basis to pass off the essential attributes of power assigned to other branches of our government. *See Clinton v. City of New York*, 524 U.S. 417, 447-49 (1998); *I.N.S. v. Chadha*, 462 U.S.

---

in or related to cases under, Title 11), yet only determinatively to its dissent for the proposition that there is no principled difference between the work that Congress may assign to Article I courts and that which must be assigned, constitutionally, to Article III courts. Indeed, the Court in *Marathon* (1) explicitly disclaims the "ad hoc balancing" approach implicit in the majority's reasoning—that "petty offenses" are less significant, *id.* at 70 n.25; (2) highlights that *Palmore* is limited to the "unique" District of Columbia and "territories outside the States" which are "specialized areas having particularized needs," *id.* at 75-76 (internal quotation marks omitted); (3) reinforces Congress's power to create Article III adjuncts—performing "limited adjudicatory functions" and operating within Article III—restrained by the requirement that Article III courts retain "the essential attributes of the judicial power," *id.* at 77 n.29 (quoting *Crowell*, 285 U.S. at 51); and (4) crucially, in the Court's only discussion of the Federal Magistrates Act, the Court vindicates *Raddatz*'s principle that "the ultimate decision [would be] made by the district court," *id.* at 79-83 & n.33 (quoting *Raddatz*, 447 U.S. at 683). Finally, the majority overlooks subsequent, limiting legislative court caselaw, above all *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), whose multifaceted test likely is not met by full criminal trial authority exercised here, even if magistrate judges were, as I strongly contend they are not, Article I legislative courts. *See generally* Judith Resnik, *"Uncle Sam Modernizes His Justice": Inventing the Federal District Courts of the Twentieth Century for the District of Columbia and the Nation*, 90 Geo. L.J. 607, 638 (2002) (noting the personal as well as structural components of *Schor*'s otherwise "forgiving balancing test").

19

919, 944-59 (1983).[7]  Finally, the implications of the majority opinion's reliance on half-century old legislative court precedent, instead of the Supreme Court's more recent, half-dozen cases calibrating Article III judicial power referred to magistrate judges, are far-reaching, acknowledging that Congress could expand an Article I magistracy alongside and independent of Article III federal district courts to try federal criminal felony (even capital) cases that might arise in a federal enclave.[8]  Federal enclaves are neither few nor small, and no

---

[7] The Supreme Court's non-delegation doctrine applied to the political branches parallels the *Raddatz* principle emphasizing retained and final determining authority.  *See Mistretta v. United States*, 488 U.S. 361, 393-97 (1989) (Congress may delegate the power to promulgate sentencing guidelines to an independent sentencing commission within the judicial branch, but Congress retains power to revoke or amend any or all of the guidelines).

[8] The majority limits its holding that Article III magistrate judges are in fact Article I enclave courts as they preside over petty offense trials of cases arising in federal land acquired pursuant to Clause 17, yet the majority refers to non-Clause 17 "federal enclaves" throughout its opinion.  In support of its historical conclusion, the majority claims that Congress referred misdemeanor trial authority to the federal magistracy in numerous statutes from 1894 until 1948.  The cited statutes pertain to non-Clause 17 federal land, mostly national parks.  *See Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 529-30 (1938) (explaining that Clause 17 is "not the sole authority for the acquisition of jurisdiction" and noting that "[t]he United States has large bodies of public lands.  These properties are used for forests, parks, ranges, wild life sanctuaries, flood control, and other purposes which are not covered by Clause 17.").  As the majority points out, the first commissioner position was authorized for Yellowstone National Park, which was under exclusive federal jurisdiction though not acquired pursuant to Clause 17.  *See* Admin. Office of the U.S. Courts, *A Guide to the Legislative History of the Federal Magistrate Judges System* 2 (1995); *Yellowstone Park Transp. Co. v. Gallatin Cnty.*, 31 F.2d 644, 645 (1929); *Collins*, 304 U.S. at 529-30.  It is also important to note that the Act of October 9, 1940 conferred trial jurisdiction, *subject to the consent of the defendant*, to United States commissioners over petty offenses that were committed "in any place over which the Congress has exclusive power to legislate or over which the United States has concurrent jurisdiction . . . ."  Act of October 9, 1940, ch. 785, 54 Stat. 1058.  Again, this was not limited to Clause 17 federal enclaves, and this Act became the basis for the current magistrate judge system.  *See* 28 U.S.C. § 636(a)(1) (giving U.S. magistrate judges "all powers and duties conferred or imposed upon United States commissioners").

Adding another layer of incongruity, the statute under which Hollingsworth was convicted, 18 U.S.C. § 113, applies to "the special maritime and territorial jurisdiction of the United States," which includes much more than Clause 17 federal property.  *See* 18 U.S.C. § 7 (defining the "special maritime and territorial jurisdiction of the United States" as including, among other things: "[t]he high seas [and] any other waters within the admiralty and maritime jurisdiction of the United States;" vessels, aircrafts, and space vehicles owned by the United States; "lands reserved or acquired for the use of the United States, and under

limiting principle is offered other than that presently Congress has refrained from extending the orbit of first-instance criminal trial adjudication to the nearly three thousand other offenses set forth in its federal criminal code. *See Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1054 (7th Cir. 1984) (Posner, J., dissenting) ("Maybe section 636(c) [conferring civil jurisdiction on magistrate judges *with* parties' consent] is a small violation of the Constitution. But the time to deal with this small violation is now, before it sends down roots. . . . It will be harder to enforce the Constitution against the excesses of the magistrate system when magistrates try 10 or 20 or 50 percent of the nation's federal trials—when . . . section 636(c) is indispensable to coping with the federal judicial workload—than it is today.").

It is said that a well-built house requires but little repairs. Article III federal district judges are not over-burdened in their most essential judicial

---

the exclusive or concurrent jurisdiction thereof;" and "[a]ny island, rock, or key containing deposits of guano"). The majority overlooks this further discrepancy in order to draw analogy with *Palmore*, in which the Court narrowed its holding to laws "applicable only within the District of Columbia." *Palmore*, 411 U.S. at 410.

The majority emphasizes that Hollingsworth was charged for a crime that is applicable in "federal enclaves," but the term "federal enclave" can refer to a variety of federally owned land—land that is exclusively, partially, or concurrently under the jurisdiction of the federal government vis-à-vis the States. The jurisdictional status depends on which statute was in place when the land was acquired by the federal government or when the federal government accepted jurisdiction. Roger W. Haines, Jr., *Federal Enclave Law* 17 (2011). Already half a century ago, six million acres of land were under "exclusive" federal jurisdiction and thirty-six million were under either "partial" or "concurrent" federal jurisdiction. *Id.* at 56. These lands include military bases, national forests and parks, federal prisons, and public health facilities, among other property. *Id.* at 58-72. Also problematic for the majority's position, within one federal property there can exist numerous jurisdictional statuses. For instance, the San Diego Naval Station consists of federally owned land that is under partial and exclusive federal jurisdiction as well as some federally owned land under state jurisdiction. *Id.* at 243, 275. Under the majority's opinion, whether a defendant has a right to be tried by an Article III judge will depend on which of the neighboring piers he is standing on; or if the defendant is standing on the main public road through the Naval Station, which was retroceded to the State, Article III protections apparently would attach, in the middle of the enclave. *See id.* at 243-45.

21

function, trying federal criminal cases.  Without consent, persons accused of federal offenses should not lose their liberty except after trial in a constitutional court, unless an Article III judge reserves "the ultimate decisionmaking authority." *Marathon*, 458 U.S. at 79 (citing *Raddatz*, 447 U.S. at 682).